UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANGELA STINGLEY,

Plaintiff,

v.

HOLCIM (U.S.) INC.,

Defendant.

Case Number 24-12114
Honorable David M. Lawson

______________________________________/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DISMISSING AMENDED COMPLAINT WITH PREJUDICE**

Plaintiff Angela Stingley was hired by defendant Holcim (U.S.) as a senior tax analyst in May 2023. She was fired in April 2024 allegedly for performance issues. Stingley, however, says that race and gender played a role in the decision to terminate her, and she filed a complaint (later amended) alleging unlawful discrimination and retaliation under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, and Michigan's Elliott-Larsen Civil Rights Act. After the discovery period closed, the defendant filed the present motion for summary judgment. The Court heard oral argument on August 13, 2026. The plaintiff has offered evidence to establish a *prima facie* case, but because she has not offered sufficient evidence to create a material fact question about whether the defendant's lawful reasons for firing her were a pretext for discrimination or retaliation, the Court will grant the motion and dismiss the case.

I.

The parties agree on the basic chronology and context of this employment dispute. Defendant Holcim (U.S.) Inc. (a/k/a "Amrize") states on its public website that it is "a global leader in innovative and sustainable building solutions," engaged in the business of "enabling greener cities, smarter infrastructure and improving living standards around the world," with their primary

services being the delivery of designs and building materials for large scale commercial and infrastructure projects, both in the United States and in other global markets. *See* Holcim (U.S.) / Amrize Company Profile, https://amrize.com/us/en/amrize-homepage.html (last visited Sept. 15, 2026).

Plaintiff Angela Stingley is a 56-year-old African-American woman. She was hired by the defendant as a Senior Tax Analyst on May 22, 2023 and began work on June 20, 2023, reporting to Eric Beaupre, Holcim's Senior Manager of US Indirect Tax. Her duties included reviewing corporate tax returns, assessing the taxability of "various projects" undertaken by the company, and responding to queries submitted via email to a departmental "Tax Mailbox." Initially, Beaupre assigned Stingley to "use tax" determinations, which involved assessing whether items bought by the company were subject to local use taxes (i.e., sales tax). The parties dispute whether the plaintiff performed these and other duties in a satisfactory manner. Her performance record is discussed later. What is not disputed, however, is that after Stingley filed a complaint with the human resources department about Beaupre's conduct in January 2024, and after she received an unfavorable performance review from Beaupre in that same month, Vickie Hurst, Holcim's Head of Indirect Tax, took over as Stingley's supervisor. On February 29, 2024, Hurst put Stingley on a Performance Improvement Plan ("PIP"), which stated that Holcim would consider terminating her employment if Stingley failed to improve her work performance to address deficiencies listed in the PIP within 30 days. Letter dated February 29, 2024, ECF No. 18-12, PageID.439-40. Hurst attested that Stingley "failed to show significant improvement on the performance issues identified in her PIP," and that as a result Hurst "made the decision to terminate Ms. Stingley's employment . . . effective April 5, 2024." Vickie Hurst decl., ECF No. 18-21, PageID.495.

When she was hired, the plaintiff executed a "Confidentiality Agreement," which provided that she "[understood] and agree[d] that [she] may only use Confidential Information (defined below) for purposes of carrying out [her] job duties for Holcim, and . . . may not otherwise make use of or disclose any such information during or after termination of [] employment with Holcim without the express written consent of the General Counsel of Holcim." Confidentiality Agreement, ECF No. 18-5, PageID.405. "Confidential Information" is defined in the agreement to "include[] all of the Company's trade secrets it currently has or may acquire, confidential and proprietary information, and all other non-public information and data of or about the Company and its business, written or otherwise, including, but not limited to . . . any non-public prices, discounts, commissions, costs, purchasing information, supplier or vendor information, earnings . . . business plans . . . [and] other business arrangements, as well as . . . work product [the employee] create[s] in rendering services for the Company." *Ibid.* Stingley further acknowledged that "[a]ny documents containing Confidential Information, whether prepared by [her] or furnished by Holcim, must be returned to Holcim at the Company's request or no later than 24 hours after termination of [her] employment," and that she "may not make or retain copies of such documents." *Ibid.* However, the agreement also states: "Nothing in this Agreement is intended to prohibit [the employee] from sharing Confidential Information if required by law or administrative agency process, or to prohibit [her] from engaging in protected concerted activity." *Id.* at 406.

The foregoing facts are uncontested. The parties do not see eye to eye, however, on some of the other facts in the record. The defendant highlights evidence indicating that the plaintiff was not performing up to expectations.

For her part, the plaintiff testified at her deposition that the first meeting she had with Beaupre in August 2023 did not go well. She admitted that when assigned to perform use tax

assessments, she "would review what the previous [tax analyst] did for that same purchase and use that assessment," and Beaupre "immediately said no, you can't do that," and "[y]ou need to do your due diligence because we found out that using information another tax employee used is hurting us on audits." Angela Stingley dep., ECF No. 18-2, PageID.367. Stingley agreed that "[j]ust copying what someone did [in] a prior month isn't acceptable" when making use tax determinations. *Id.* at 369. But Stingley testified that during the meeting Beaupre went on to "attack her character," by saying, "You are a senior analyst with all this experience and you're telling me that you don't know how to do this. You should be able to do this. You are a senior analyst." *Id.* at 371. In response to Beaupre's criticism, the plaintiff rose from her seat, "looked at the door," and gestured indicating that she "want[ed] to get out of [the office]," and then left the room and returned to her desk. *Id.* at 371-72. She was upset and felt she had been treated unfairly by Beaupre because she had only been with the company for a few weeks and he had "ignored [her] for the first few weeks [she] was there," then criticized her competence "as if [she] had worked for the company for a year" and had experience and familiarity with the business on par with other long term staff. *Ibid.*

The defendant points to an email sent by Stingley on November 30, 2023 about a specific project, in which she wrote: "I do not like failing but I have to waive [sic] a white flag on this [Terrebonne tax return] project. I've spent weeks upon weeks since August and it is still not right/done or approved. I'm sorry but I do not know what else to do to complete this project." Email chain dated Dec. 4, 2023, ECF No. 18-10, PageID.429. Beaupre replied that he "did not understand why we are 'waiving the white flag' on this," because he understood that "the auditor wanted detail as to what made up our returns before approving the refund." *Ibid.* After Stingley reiterated that she was "personally waiving [sic] the white flag" and awaiting Beaupre to approve

the work, Beaupre then responded stating that he had revised the documents himself and that Stingley could forward them to the auditor if she was "good with it." *Ibid.*

The defendant also highlights an email sent by Vickie Hurst on January 10, 2024, in which Hurst directed Stingley: "Pease make a dent in the tax mailbox. The backlog is building. Ideally the mailbox should be cleared each day, unless there are items where we are waiting for responses." Email dated Jan. 10, 2024, ECF No. 18-25, PageID.516.

The defendant also points to an email sent by Beaupre on January 16, 2024, in which he wrote that he was rejecting a tax return submitted by Stingley because her use tax determinations were incorrect, and that Beaupre had corrected several items in the return to list them as taxable. Email dated Jan. 16, 2024, ECF No. 18-24, PageID.514.

Vicki Hurst, Beaupre's superior, testified that although she could not pinpoint a date, Beaupre "told [her] that he had some issues with [Stingley's] performance" sometime in Fall 2023, but she could not recall when the conversation occurred and could not identify any documentation of performance concerns. Vickie Hurst dep., ECF No. 18-9, PageID.426. Hurst stated that she never had any conversation with Stingley about her performance until she put Stingley on the PIP in February 2024. *Ibid.*

On January 26, 2024, Beaupre issued a performance review for Stingley in which he rated her performance as "inconsistent." Performance Review dated Jan. 26, 2024, ECF No. 18-11, PageID.437. As grounds for the "inconsistent" rating, Beaupre stated:

> Angela has a lot of experience with return preparation and compliance and has sought to make improvements. Angela has been very vocal about issues with return preparation and specific preparers. I would like to see Angela work on her time management. It appears almost every activity performed has, or requires, extensive notes which may be contributing to delays or frustration in assigned tasks. While we strive to hit deadlines, feeling obligated to work at 2:30 a.m. is not encouraged or [sic] should really be necessary. We have also discussed her focusing on the big picture items and not getting caught up on things that are in the grand scheme of

> things immaterial. I would like to see Angela do a better job on the tax research she does on her month to month use tax reviews. Reviews of her determinations lead me to believe she doesn't have much experience researching exemptions related to manufacturing. Also, I would like Angela to not see constructive criticism as a negative. We need to be able to work together in an environment where we feel comfortable communicating and reaching out with questions or issues.

*Ibid.* Beaupre also indicated that Stingley's work product relating to the Terrebonne tax return "can be seen as confusing for others to review," and that he "would like to see her secure the Terrebonne refunds and prepare files consistent with our other work papers." *Id.* at 434. In the "employee evaluation" section, Stingley self-assessed her performance as "good," and in the employee response to Beaupre's comments she wrote, "Please note I've been employed for performance review purposes 6 months and 11 days," and "This is not looking like a performance review. This is looking like something else." *Id.* at 437.

Ethan Vervelde, a Human Resources Manager with Holcim, attested that Stingley sent him an email on January 15, 2024 "requesting the number for Holcim's integrity hotline," which Vervelde provided. Ethan Vervelde decl., ECF No. 18-16, PageID.478. On January 26, 2024, Stingley sent Vervelde an email indicating that she viewed her performance evaluation by Beaupre as "a form of retaliation," and stating that she "would like a full investigation if her employment is terminated." Vervelde scheduled a meeting with Stingley on January 29, 2024. During that meeting, Stingley told Vervelde "for the first time that she felt Eric Beaupre was creating a toxic work environment, treats women poorly (including treating diverse women differently), and is disrespectful and condescending." *Id.* at 479. Vervelde conducted an investigation of the claims, which included interviewing Stingley and other women employees whom Stingley had identified. However, none of the other women backed up Stingley's claims. *Ibid.* On January 26, 2024, Beaupre contacted Vervelde to discuss Stingley's performance, and at that time Vervelde informed Beaupre that Stingley had filed an HR complaint against him. *Ibid.* On February 15, 2024,

Vervelde met with Stingley again and told her that he could not substantiate her claims about Beaupre, but that Stingley would be reporting to Vickie Hurst going forward. *Ibid.*; *see also* Letter dated Feb. 15, 2024, ECF No. 18-18.

Hurst confirmed that, on February 15, 2024, after Beaupre had issued Stingley the "inconsistent" performance review, and in response to Stingley's complaints about Beaupre's "bias" against her, Vickie Hurst took over as Stingley's direct supervisor. Vickie Hurst decl., ECF No. 18-21, PageID.496. Hurst attested that due to Stingley's "ongoing performance problems, including those I observed when I took over has her supervisor, on February 29, 2024, a decision was made to issue Ms. Stingley a performance improvement plan ('PIP')." *Ibid.* The letter advising Stingley about the PIP identified "specific issues" with her performance including Stingley's (1) failure to complete work papers for the Terrebonne Parish tax return "according to Holcim's indirect tax standards," (2) "deficiencies in [] analyzing and understanding [] manufacturing tax concepts," (3) the fact that Stingley "hasn't been doing [her] portion in making progress" on correspondence in the Tax Mailbox, (4) the fact that Stingley had "held up tax returns numerous times due to issues that were inconsequential or immaterial causing delays in the compliance process," and (5) "taking an excessive amount of time to complete tax return reviews which then impacts [the] ability to complete other tasks promptly," noting that "[i]t should take a max of 15 min[utes] to review a standard tax return." The PIP letter advised the plaintiff that she could be terminated if her performance did not improve within 30 days.

On March 11, 2024, Hurst sent Stingley a memo reviewing her progress under the PIP. Email dated Mar. 11, 2024, ECF No. 18-19, PageID.488-89. Hurst stated that (1) the Terrebonne tax returns still had not been completed, (2) "it does not appear that you spent sufficient time in the Tax Mailbox," and (3) 10 tax returns which were submitted for Stingley to review and approve

between "Thursday late afternoon" and Friday around 2:00 p.m. had not been reviewed or approved by Stingley until the following Monday morning, which Hurst stated was not timely or efficient processing of the work queue and could delay or complicate the process of tax reporting. Hurst also wrote that Stingley had "completed 100% of [her] assigned use tax reviews," but she observed that those were "lower priority," and stated that completing use tax reviews should have been deferred given that other, higher priority tasks like processing inquiries in the Tax Mailbox were not being completed. *Ibid.* Hurst found that Stingley "didn't meet the requirements of the PIP," and decided to terminate her. Hurst dep., ECF No. 18-9, PageID.425.

During discovery, the plaintiff produced to the defendant copies of documents such as tax returns and other forms that she had printed from Holcim's work files on her own initiative between January and March 2024 and kept after she was terminated. The plaintiff testified at her deposition that she printed the documents "to show or prove that [she] was working on the Terrebonne refund request." Stingley dep., ECF No. 18-2, PageID.381. When asked why she never showed the documents to Beaupre or Hurst in response to criticisms that she was not getting the Terrebonne refund work done, she said, "I don't have an answer for that question." *Ibid.*

The plaintiff filed her complaint in this case on August 13, 2024 pleading claims of unlawful race and gender-based discrimination and retaliation. She amended the complaint on February 19, 2025. At the summary judgment stage, she has abandoned all but her retaliation claim, which she brings under state and federal law in counts I (under 42 U.S.C. § 1981), III (under Mich. Comp. Laws § 37.2701), and V (under 42 U.S.C. § 2000-e3). The defendants seek summary judgment in their favor on all those counts.

II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute. *Id.* at 558. (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

A.

All three statutory schemes prohibit employers from retaliating against employees because they have "opposed any practice made an unlawful employment practice by [law], or because [they have] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [law].'" *Pannek v. U.S. Bank Nat'l Ass'n*, --- F.4th ---, No. 25-3706, 2026 WL 2277080, at *3 (6th Cir. Aug. 7, 2026) (applying Title VII and quoting 42 U.S.C. §

2000e-3(a)). The parties agree and it is well settled that "[t]he standards for retaliation claims and discrimination claims, respectively, are the same across § 1981, ELCRA, and Title VII." *Newson v. NYX, LLC*, No. 25-2095, 2026 WL 2126148, at *3 (6th Cir. July 23, 2026) (citing *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771 (6th Cir. 2018)).

"An employee can establish a retaliation claim using direct or circumstantial evidence." *Pannek*, 2026 WL 2277080, at *3 (citing *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 644-45 (6th Cir. 2015)). The plaintiff here does not rely on direct evidence of retaliation. Where the plaintiff "[relies] on circumstantial evidence [the Court will] evaluate their retaliation claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Ibid.* (citing *Hamm v. Pullman SST, Inc.*, 167 F.4th 382, 393 (6th Cir. 2026)).

"Under the *McDonnell Douglas* framework, [the plaintiff] must first establish a prima facie case for retaliation. To do so, [she] must show: '(1) [she] engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against [her], and (4) there was a causal connection between the protected activity and the adverse employment action.'" *Pannek*, 2026 WL 2277080, at *3 (quoting *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008)). "If successful, the burden of production shifts to [the defendant]. It must articulate 'a legitimate, nondiscriminatory reason' for firing [the plaintiff]." *Id.* at *4. "If [the defendant] satisfies its burden, then [the plaintiff] must show that [the defendant's] proffered reason was 'only a pretext designed to mask retaliation.'" *Ibid.* "'Although the burden of production shifts between the parties, the plaintiff bears the burden of persuasion through the process.'" *Ibid.* (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)).

The defendant argues that the plaintiff fails to establish a *prima facie* case because there is no evidence of a causal connection between any protected conduct and Stingley's termination or any other adverse employment action visited upon her. Stingley relies on her January 29, 2024 complaint to the Human Resources Department about her supervisor's criticism of her as the protected activity. But the defendant contends that the three-month gap between the complaint and the termination on April 5, 2024 is too long to support an inference of causation. The defendant also insists that the plaintiff has offered no evidence that its legitimate reason for termination — poor performance — was a pretext for retaliation. Finally, the defendant raises an argument that Stingley's violation of the company's confidentiality agreement (when she copied some of the tax returns she was working on) is after-acquired evidence that would support termination and cut off any future damages.

Stingley responds that the Court must consider the poor performance review, which occurred 11 days after her complaint to Human Resources, when assessing evidence of causation. She says that is when her supervisor Beaupre started building a file on her, which led to the PIP and ultimately to her firing. She also says that evidence of pretext can be found in: her testimony that the tax returns that she purportedly mishandled could not be processed to defendant's satisfaction even when assigned to a senior 7th-year tax analyst; her testimony that she "held up" signing off on tax returns because questionable accounting methods would have understated income contrary to the requirements of the Internal Revenue Code; the acknowledgement by the plaintiff's indirect supervisor, Vickie Hurst, that handling email inquiries was difficult even for more experienced analysts than the plaintiff; the plaintiff's testimony that she never was informed about the defendant's policies on handling of indirect taxation; and that when she was told not to rely on prior returns to prepare current work product, she complied with that directive. This

evidence, she says, demonstrates that the reasons for termination were manufactured and not backed up by factual substance. She also argues that pretext is demonstrated because, after she was placed on a PIP and placed under Hurst's direct supervision, Hurst failed to follow the plan of meeting with the plaintiff weekly to review her progress, and she did not meet with the plaintiff for three out of four weeks while the plaintiff was on the PIP before her termination.

A.

The parties apparently agree that the plaintiff has made out all but one of the required elements of a *prima facie* case of retaliation, and they focus their presentations exclusively on the element of causation. The record is sufficient to create a fact question on that element.

The defendant insists that the plaintiff cannot establish causation because the allegedly retaliatory act of delivering a negative performance review occurred before the meeting with the defendant's HR representative on January 29, 2024. However, the plaintiff has attested that she communicated the substance of her concerns initially via a telephone call to HR Manager Ethan Vervelde on January 15, 2024, before the negative performance review was conveyed. There is, therefore, a dispute of fact concerning the sequence of events.

The defendant also insists that a plaintiff cannot obtain immunity from the consequences of her poor performance by engaging in protected activity, and that temporal proximity alone is not sufficient to establish causation. However, the Sixth Circuit recently has reiterated that temporal proximity of protected activity can suffice to support an inference of causation when the delay is within less than a month. *Pannek*, 2026 WL 2277080, at *4 ("[C]ontrary to U.S. Bank's assertion, evidence exists in the record that Bolton may have decided to fire Strotman after he participated in the ethics investigation. The close temporal proximity between Bolton learning of the protected activity [on March 27, 2018] and his decision to terminate Pannek and Strotman [on

April 20, 2018] could suffice to show causation.") (citing *Milczak v. Gen. Motors, LLC*, 102 F.4th 772, 789 (6th Cir. 2024)). Moreover, the plaintiff has pointed to somewhat more than temporal proximity alone, because she also has identified evidence that her interim supervisor, Vickie Hurst, failed to follow the procedure outlined by the PIP, which specified regular bi-weekly meetings with the plaintiff to review her progress, instead accomplishing the bi-weekly conferences only "one or two weeks" during the period when the PIP was in effect. The Sixth Circuit has recognized that temporal proximity along with evidence of an employer's failure to follow its own policies governing the termination process can combine to bolster the showing of causation. *Id.* at *6-7 ("Bolton seemingly failed to follow U.S. Bank's termination policy by deciding to fire Pannek and Strotman before completing the PGA process — a process U.S. Bank takes so seriously that it later fired Gemrich, in part, for failing to properly execute a PGA. Typically, 'an employer's failure to follow self-imposed regulations or procedures' will not, on its own, suffice to show pretext. That said, an employer's failure to follow its own policies and procedures, 'while not enough on its own to establish pretext, can be considered as part of the constellation of evidence.'" (quoting *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005); *Kean v. Brinker Int'l, Inc.*, 140 F.4th 759, 776 (6th Cir. 2025)).

B.

Satisfaction of the *prima facie* case component, however, does not foreclose summary judgment here, because the plaintiff has failed adequately to repel the defendant's showing that it had a legitimate, non-discriminatory reason for the termination. At this stage of the analysis, the plaintiff "must point to 'evidence that would allow a reasonable jury to find that' [the defendant's] 'identified reason' for terminating their employment was pretext for its real retaliatory reason." *Pannek*, 2026 WL 2277080, at *5 (quoting Hamm, 167 F.4th at 393). "An employee 'can show

pretext in three interrelated ways: (1) that the proffered reason had no basis in fact, (2) that the proffered reason did not actually motivate the employer's action, or (3) that the proffered reason was insufficient to motivate the employer's action.'" *Ibid.* (quoting *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 350-51 (6th Cir. 2021)). "These are common ways to show pretext, but they 'are not the only ways.'" *Ibid.* (quoting *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020)). "Instead, these 'categories are simply a convenient way of marshaling evidence and focusing it on the ultimate inquiry: did the employer fire the employee for the stated reason or not?'" *Ibid.* "The burden of showing pretext 'is not heavy, though, as summary judgment is warranted only if no reasonable juror could conclude that the employer's offered reason was pretextual.'" *Ibid.* (quoting *George v. Youngstown State Univ.*, 966 F.3d 446, 462 (6th Cir. 2020)). "Put another way, an employee 'does not need to prove pretext; [she] only needs to show that the question of pretext is a genuine factual dispute.'" *Ibid.* (quoting *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 667 (6th Cir. 2020)).

The defendant has identified several ways in which the plaintiff failed to perform the duties of her position, leading to an unfavorable review, the institution of a PIP, and, after she failed completely to satisfy the requirements of the PIP, her termination. Although the plaintiff testified at length about her "disagreement" with Beaupre's negative comments about her performance, she has not presented any evidence that the documented failures did not in fact occur. Moreover, it is well settled that a plaintiff's own subjective belief that her performance was satisfactory is not sufficient to create a jury question on pretext. *See, e.g.*, *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992) (holding that the plaintiff's subjective skepticism regarding the truth of an employer's representation does not raise a triable issue as to pretext); *see also Hedrick v. W. Reserve Cas. Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) (indicating that disagreement with what an

employee's supervisor considers important to an employee's job performance is not enough to show pretext).

Both Beaupre and Hurst documented the plaintiff's failure over the span of several months to complete an assignment to submit tax returns connected with purchases in Terrebonne Parish. Hurst documented the plaintiff's failure on this task, and the plaintiff admitted her own failure to perform the assignment in November 2023; it is undisputed that the work still was not completed by March 2024 after the PIP was instituted specifically calling out this issue. The plaintiff also insists that she was not given appropriate support to deal with issues presented by queries submitted through the Tax Mailbox, but she has not offered any evidence contradicting documented observations by Beaupre and Hurst that she failed to deliver timely responses to inquiries she was responsible for handling, or that she failed to satisfy Hurst's directive to clear the mailbox as a matter of daily routine. She also offers no rebuttal to Hurst's observation that she failed to review and forward 10 tax returns in a timely manner while she was under the PIP, leaving them to lapse until the following work week instead of reviewing and approving them immediately. In short, although the plaintiff testified extensively about her own view that her performance was adequate, and that she was "set up to fail," she has not pointed to any evidence that the specific failures documented by the defendant in her poor review and while under the PIP did not actually occur or were not the actual basis for the termination.

"In order to prove [retaliation] . . . the plaintiff must directly confront the asserted justification for the discharge." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000); *Gagne v. Northwestern Nat. Ins. Co.*, 881 F.2d 309, 314 (6th Cir. 1989)). "The plaintiff[] may not simply substitute [her] own business judgment for that of the defendant. Rather, to survive a

summary judgment motion [she] must show that a reasonable jury could conclude that the actual reasons offered by the defendant were a mere pretext for unlawful [retaliation], not that other reasonable decision-makers might have retained the plaintiff[].” *Ibid.*; *see also EEOC v. Ford Motor Co.*, 782 F.3d 753, 768 (6th Cir. 2015) (“We ‘look at the facts as they appear to the person making the decision to terminate [the employee],’ not at ‘the employee’s subjective [beliefs].” (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000)); *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 268 (6th Cir. 2010) (“Here, Schoonmaker’s main points — her evidence of ‘pretext’ — are her belief that she was a better worker than Taylor and that Spartan Graphics gave inconsistent and subjective justifications for laying her off. This evidence, however, simply does not show age discrimination.”); *Johnson v. U.S. Dep’t of Health & Hum. Servs.*, 30 F.3d 45, 47-48 (6th Cir. 1994) (“Plaintiff has failed to submit any evidence besides her own subjective testimony that she was more qualified for the job than the selectee. Accordingly, the district court did not err in crediting defendant’s testimony and concluding that plaintiff had failed to prove that defendant’s articulated reason was pretext.”). Subjective disagreement with the defendant’s business judgment about her performance is all that the plaintiff has offered here to rebut the stated justification for her discipline and termination, and that is simply not enough.

Because the plaintiff has not offered evidence that establishes a fact question on the pretext component of the circumstantial case under the *McDonnell Douglas* burden-shifting framework, she cannot withstand the defendant’s motion for summary judgment.

III.

The plaintiff has made a minimally adequate showing on the causation element of her *prima facie* case, but she has failed to rebut the defendant's proffered legitimate non-discriminatory grounds for the termination. The defendant, therefore, is entitled to judgment as a matter of law on the retaliation claim. The plaintiff has abandoned all of the other causes of action pleaded in her amended complaint.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment (ECF No. 18) is **GRANTED**.

It is further **ORDERED** that the Amended Complaint in its entirety is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: September 16, 2026